Jeffrey D. Wexler, State Bar No. 132256
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone: (213) 488-7129
Facsimile No.: (213) 629-1033
jeffrey.wexler@pillsburylaw.com

Attorneys for Plaintiffs and Counterdefendants
Dependable Solutions, Inc., Dependable Rights, Ltd., and Martin Malysz and Counterdefendants Timothy Medora and The Medora Group, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| DEPENDABLE SOLUTIONS, INC., a California corporation; DEPENDABLE RIGHTS, LTD., a United Kingdom private limited company; and MARTIN MALYSZ,<br><br>Plaintiffs,<br>v.<br>ZELJKO RAKOCEVIC, an individual; WESTEND SOFTWARE, INC., a California corporation,<br><br>Defendants.<br><br>AND RELATED CROSS-COMPLAINT | Case No. CV 15-7481 JFW (KSx)<br><br>**THIRD AMENDED COMPLAINT FOR RESCISSION BASED ON FRAUD IN THE INDUCEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

4824-9077-7899.v1

Plaintiffs Dependable Solutions, Inc., Dependable Rights, Ltd., and Martin Malysz (collectively, "Plaintiffs") allege as follows:

## BACKGROUND FACTS

1. Plaintiff Dependable Solutions, Inc. ("DSI") is, and at all times mentioned was, a California corporation with a principal place of business in Los Angeles County, California.

2. Plaintiff Dependable Rights, Ltd. ("Dependable Rights") is a United Kingdom private limited company. Dependable Rights is a wholly owned subsidiary of DSI, and is a party to certain contracts at issue in this litigation. For that sole reason, Dependable Rights is a party herein.

3. Plaintiff Martin Malysz ("Malysz") is an individual who at all times relevant hereto resided in the City and County of Los Angeles.

4. Plaintiffs are informed and believe, and thereon allege, that Defendant WestEnd Software, Inc. ("WestEnd") is, and at all times mentioned was, a California corporation with a principal place of business in Los Angeles County, California.

5. Plaintiffs are informed and believe, and thereon alleges, that Defendant Zeljko Rakocevic ("Zeljko") is an individual who all times relevant hereto resided in the City and County of Los Angeles. Plaintiff is informed and believes and thereon alleges that Zeljko was born in what is now Serbia, is the sole shareholder of defendant WestEnd, and exerts sole and exclusive management and control over that entity. Defendants WestEnd and Zeljko are hereafter collectively referred to as the "WestEnd Defendants."

6. Plaintiffs are informed and believe and thereon allege that each of the defendants is or was the agent, employee, partner, joint venturer, spouse, or domestic partner of the other defendants and that each of the defendants was acting within the course and scope of said agency, employment, partnership, joint venture, or on

4824-9077-7899.v1

1

1  behalf of the community property of his/her spouse or domestic partner in doing the
2  things alleged herein.

3       7.    In 2005 Malysz founded DSI. DSI was formed to provide a suite of
4  software applications that automate contract management, financial, royalty and
5  creative operations through web-based solutions for licensors, agents and licensees
6  of consumer products.

7       8.    DSI has become the recognized leader in consumer products rights
8  licensing software. DSI's program suite, called "Dependable Rights Manager" or
9  "DRM," was launched in 2005.

10      9.    Pursuant to a June 29, 2007 letter agreement from DSI, countersigned
11  by Zeljko on July 17, 2007, DSI hired Zeljko as Director of Development, an at-will,
12  full-time salaried position. On July 17, 2007, Zeljko signed a DSI Employee
13  Proprietary Information Agreement in which he agreed that, *inter alia*: "Any work
14  produced during my period of employment at Dependable Solutions, Inc. will be
15  considered 'work for hire.' All rights associated with such work will be completely
16  (100%) owned by Dependable Solutions, Inc." Zeljko initially supervised the
17  existing staff of three programmers and was tasked with upgrading the DRM suite of
18  software applications.

19      10.    By approximately early 2008 Zeljko had replaced all the American
20  programmers with Serbian staff programmers. These new programmers reported
21  exclusively to Zeljko and were supervised directly by him as Director of
22  Development at DSI.

23      11.    Zeljko requested that some of the Serbian programmers be paid part of
24  their salaries through WestEnd to take advantage of certain alleged tax benefits
25  related to his status as a Serbian national. Zeljko also requested that a portion of his
26  DSI salary be paid to WestEnd for the same reasons. However, Zeljko and the
27  Serbian programmers were at all times staff employees of DSI. WestEnd was a mere
28  conduit for partial payments by DSI to Zeljko and the Serbian programmers.

12. During Zeljko's employment at DSI from August 2007 through the end of May 2014, all software programming he participated in was done within the scope of his employment at DSI. Likewise, all software programming done by the Serbian programmers was done within the scope of their employment with DSI. All software programming done by Zeljko and the Serbian programmers was a work-for-hire by DSI and is owned by DSI, and DSI holds all copyrights thereto. This includes all updates and versions of the DRM software programmed through and by Zeljko and the Serbian programmers.

13. In 2012 Zeljko and Malysz entered into negotiations regarding transferring a 50% share of ownership in DSI from Malysz to Zeljko. Beginning in approximately August 2013 serious discussions and negotiations began between the parties which continued on and off through 2014. In approximately December of 2013 an accounting firm was engaged to compile financial and accounting information for use of the parties in trying to come to an agreement to share ownership of DSI. No agreement regarding joint ownership was ever reached.

14. During the period from March through May 2014, and on prior occasions, DSI had demanded that Zeljko provide DSI with a copy of the source code to the DRM software, place it into escrow as required by contracts with customers, and provide all passwords and access codes to allow other employees of DSI to access, use and support the source code. Zeljko continually refused those demands.

15. Plaintiffs are informed and believe that Zeljko intentionally retained sole access and control of the source code to use as leverage to try to obtain a 50% interest in DSI on terms favorable to him and unfavorable to Malysz. On a number of occasions in the Spring of 2014 Zeljko threatened to quit DSI, to keep the source code for himself, to prevent the DRM software from operating, and to make defamatory remarks to DSI customers with the express intent to destroy Malysz and DSI.

16.  When negotiations over possible joint ownership were breaking down in the Spring of 2014, the parties turned their negotiations toward Zeljko's separation from DSI, obtaining possession and control of the source code, obtaining a release of any and all of Zeljko's claims, and obtaining a commitment from Zeljko not to compete with DSI for at least two years.

17.  During the negotiations leading up to the Settlement Agreements Zeljko represented, for the very first time, that three binary subprograms included in DRM had been personally developed by him prior to working at DSI and, thus, that they were not works for hire belonging to DSI.  (Those three programs (the "WS .dll Files") have the file extension ".dll" and are identified in Section 1.3 of the License Agreement contained in Exhibit "1" hereto as WS.Framework.dll, WSWebUI.dll, and WSCompArtWebUI.dll.)  Those representations were made by Zeljko, individually and through his counsel, Robert Conrad, to Plaintiffs, through Malysz and Plaintiffs' counsel Chris Halling and Christopher Adishian, as follows:

    a.  First, Mr. Conrad sent an April 11, 2014 letter to Mr. Adishian, counsel for Malysz, in which he stated that, *inter alia*: (i) "[f]rom 2003 to 2004, Rakocevic took time off to write the core software for general purpose enterprise applications (the 'core software') that could provide a multitude of functions for all of a company's computers (be it hundreds or thousands) that were connected to one or more websites"; (ii) [b]y 2004, the core software was fully operational"; and (iii) "[t]he DRM software now licensed out by DSI is just one of many software products that relies on and cannot run without the core software."

    b.  Second, Mr. Conrad sent an April 24, 2014 letter to Mr. Halling, counsel for DSI, in which he stated, *inter alia*, that: (i) "[a]lthough work for hire laws may apply in certain instances, they do not apply to any of the core software that Zeljko completed in 2005

before ever meeting Marty. . . ; and (ii) "Zeljko owns all of the intellectual property rights in that core software and will not deposit into escrow the source code to that software, which is a trade secret owned by him, or divulge it to DSI."

      c.     Third, at an April 25, 2015 meeting at Mr. Conrad's offices in Century City, Mr. Conrad and Zeljko repeated and elaborated on what was stated in Mr. Conrad's letter of April 24, 2014, telling Malysz and Messrs. Halling and Adishian that Zeljko had developed the "core software" in 2005 before ever meeting Malysz, that such software was therefore not a work for hire owned by DSI, and that Zeljko owned that software.

      d.     Fourth, in a May 13, 2014 telephone call, Mr. Conrad told Mr. Halling that the core software had not been changed since 2005.

      e.     Fifth, in a May 7, 2014 e-mail, Mr. Halling asked Mr. Conrad to have Zeljko give Malysz "a list of the programs that he claims as part of the core software."  On May 9, 2014, Mr. Conrad sent Mr. Halling a draft license agreement that defined "Core Software" to "mean[] the WestEnd Core Software for Enterprise Web Applications™ that provides the main underlying support for all pages and main foundation functionality of the DRM Software, including the Core Software Functionality, as well as other web applications based on the Microsoft ASP.NET framework.  The Core Software is divided into three binary files WS.Framework.dll, WSWebUI.dll and WSCompArtWebUI.dll."

      f.     A May 16, 2014 Lifecycle Data Availability Review prepared for DSI by Creative Intellects in connection with the negotiation of the settlement repeated Zeljko's representations that he had created the core software before working with DSI.

4824-9077-7899.v1

5

18.     On or about May 19, 2015, the WestEnd Defendants provided DSI with a Word document named Core code description 051914.docx. That document represented that the WS .dll Files provided specific functionality to the DRM software.

19.     Effective May 28, 2014, Plaintiffs and the WestEnd Defendants entered into an integrated set of agreements to, among other things, allow Plaintiffs to obtain possession and control of the DRM source code and to buy out and obtain a release of all of Zeljko's claims. A copy of those agreements (consisting of a master Settlement Agreement and General Release (the "Master Agreement"), a Bill of Sale and Assignment, a License Agreement, and an Employment Agreement (collectively the "Settlement Agreements")) is attached hereto, marked as Exhibit "1," and incorporated herein. The purpose of the Settlement Agreements was to buy Zeljko out of any claim to the business, to obtain his covenant not to compete with DSI, to obtain a transfer and assignment of all of his claims, to obtain the DRM source code and intellectual property associated therewith, and to pay him over $1,100,000.

20.     Consistent with the representations by the WestEnd Defendants and their counsel that the three binary subprograms included in DRM (*i.e.*, the three WS .dll Files) had been personally developed by Zeljko prior to working at DSI and, thus, that they were not works for hire belonging to DSI, the Master Agreement stated, in Recital D thereto, that the WestEnd Defendants claimed that: (a) "one or both of [them] owns and has shared rights to the DRM Software"; and (b) "DSI does not own the DRM Software."

21.     In paragraph 2.1 of the License Agreement, WestEnd represented that "WestEnd is the sole and exclusive owner of the WestEnd Software and all patent rights, copyrights, trademarks, trade secret and other intellectual property rights therein and related thereto (collectively, the 'WestEnd IP')." (The License Agreement defined the "WestEnd Software" as the three WS .dll Files and a DNG

software program created by Zeljko pursuant to a May 7, 2014 Software Agreement between Zeljko and DSI.)

22. Subsequent to entering into the Settlement Agreements, DSI determined that the WestEnd Defendants' representations were false in several respects.

23. First, the WestEnd Defendants' representations that Zeljko had personally developed the three WS .dll Files prior to working for DSI (and that the three WS .dll Files were therefore not works for hire for DSI), that the WestEnd Defendants owned and had shared rights to the DRM Software, and that DSI did not own the DRM software were false. The true facts are that the three WS .dll Files contained code that came directly from the DRM product developed during Zeljko's employment at DSI, including code from Microsoft, various open source projects, and at least one licensed third-party product, as well as code of unknown origin. That the WS .dll Files were developed at least in part during Zeljko's employment at DSI is demonstrated by the fact that the code in such Files contained internal and external references to the DRM product, including dated, customer-specific information in the form of SSL certificates. For example, but without limitation: (a) the file WS.Framework.dll includes a hardcoded server name that points to a DSI server that was built using Windows Server 2008 R2, which first became available in 2008; (b) the WS .dll Files use Microsoft C# language features and libraries that were not available for production use until C# 2.0 was released in November of 2005, directly contradicting the statement that "by 2004 the software was fully operational"; (c) the WS .dll Files include five classes (components) from the GhostScriptSharp open source project that first became available in or about 2009; and (d) the WS .dll Files include code for .xlsx files (the new Excel format released with Office 2007 in January 2007) using a third-party product called SpreadsheetGear, which first supported .xlsx files on October 14, 2008. Because the three WS .dll Files were prepared by Zeljko, in part or in full, while he was an employee of DSI, DSI owned the copyrights in those Files as works for hire.

24. Second, the WestEnd Defendants' representations that WestEnd was the sole and exclusive owner of the three WS .dll Files were false, not only because DSI owned those Files as works for hire but because those Files included code that WestEnd did not own, including (a) code from Microsoft (the code is freely available pursuant to terms that expressly prohibit redistribution for profit); (b) code from various open source projects; and (c) code from at least one licensed third-party product.

25. Third, the WestEnd Defendants' representations that the WS .dll Files provided specific functionality to the DRM software were in large part false. In reality, several key services, *e.g.*, image manipulation, PDF manipulation, file compression, Excel file manipulation, and logging, are provided by third-party products with WS code serving as a wrapper. Other represented functionality, *e.g.*, session management, application configuration, and encryption are provided natively by the Microsoft .Net framework with little or no wrapper provided by WS code and many DRM-specific touchpoints.

26. The WestEnd Defendants repackaged, renamed, assembled, and obfuscated the three WS .dll Files to conceal the facts that: (a) those Files had been prepared by Zeljko, in part or in full, while he was an employee of DSI (as is evidenced by the fact that code in the WS .dll Files contained (i) internal and external references to the DRM product, including dated, customer-specific information in the form of SSL certificates, (ii) a hardcoded server name that points to a DSI server that was built using Windows Server 2008 R2, which first became available in 2008; (iii) five classes (components) from the GhostScriptSharp open source project that first became available in or about 2009, (iv) code for .xlsx files (the new Excel format released with Office 2007 in January 2007) using a third-party product called SpreadsheetGear, which first supported .xlsx files on October 14, 2008, and (v) portions of the recently created DNG software), and that DSI therefore owned the copyrights in those Files as works for hire; (b) WestEnd was not the sole

and exclusive owner of the three WS .dll Files because those Files included code that WestEnd did not own; and (c) much of the WS .dll Files served as a wrapper to third-party sources and/or consisted of commonly known and freely available patterns and practices.

27.     At about the time of the Settlement Agreements, Zeljko told DSI's programmers that he had obfuscated the WS .dll Files.

28.     Neither DSI nor anyone else acting on DSI's behalf has decrypted, de-obfuscated, or used code-breaking software on the "WestEnd Software" (defined as the three WS .dll Files and the DNG Software).  To the contrary, there were unencrypted, unobfuscated versions of the three WS .dll Files on DSI's test servers, saved there by Zeljko in May 2014 (two of the WS .dll Files were saved on May 15, 2014, and the third WS .dll File was saved on May 22, 2014), while he was an employee of DSI, without encrypting or scrambling the source code.  On May 27, 2015, the day before the Settlement Agreements were signed, DSI discovered those unencrypted, unobfuscated versions of the three WS .dll Files on DSI's test servers and decompiled those Files.

29.     In the course of troubleshooting, fixing bugs within or adjacent to the WS .dll Files, and performing discovery necessitated by a complete lack of documentation on the part of WestEnd following the execution of the Settlement Agreements, DSI determined that: (a) two of the WS .dll Files first appeared on DSI's servers at some time between March 2014 and May 2014, at which time the use of one similarly named DRM .dll file was discontinued and three other DRM files were heavily altered, a Microsoft-named .dll file was removed, a Pdf2Image.dll file was removed, and the third WS .dll file increased in size; and (b) the three WS .dll Files were functionally equivalent to DSI's original DRM .dll files based on their interfaces, their internals, and their interchangeability within the product. Accordingly, DSI concluded that the three WS .dll Files, which Zeljko claimed to have personally developed prior to coming to work for DSI in 2007, in actuality are

comprised of components of DSI's DRM software developed during Zeljko's employment at DSI as a work for hire, and DSI further determined that such Files are comprised in large part of third-party software not owned by WestEnd.

30. Plaintiffs are informed and believe and thereon allege that Rakocevic created or modified at least two of the three WS .dll Files at some time in or about May 2014, using code from DRM files, for the purpose of supporting his contention that three binary subprograms included in DRM had been personally developed by him prior to working at DSI and, thus, that they were not works for hire belonging to DSI.

## FIRST CLAIM FOR RELIEF
### (for Rescission Based upon Fraud in the Inducement)
### (By All Plaintiffs as Against All Defendants)

31. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 30, and incorporate them by reference as though fully set forth herein.

32. The WestEnd Defendants, and each of them, induced DSI to enter into the Settlement Agreements by making the representations alleged in paragraphs 17 through 21 above.

33. These representations were false, and were known by the WestEnd Defendants to be false at the time they were made. The true facts are those alleged in paragraphs 22 through 26 above.

34. The foregoing misrepresentations were made with the intention of inducing Plaintiffs to rely thereon and to enter into the Settlement Agreements.

35. Plaintiffs were ignorant of the falsity of the WestEnd Defendants' misrepresentations, and entered into the Settlement Agreements as a direct result of those representations, and further made substantial payments to the WestEnd Defendants in excess of $873,000 in reliance thereon in order to, among other things, secure the right to use the three WS .dll Files. Had Plaintiffs known of the falsity of the WestEnd Defendants' representations, and, in particular but without limitation

that the three WS .dll Files had not been personally developed by Zeljko prior to working at DSI (and that they thus belonged to DSI as works for hire), Plaintiffs would not have entered into the Settlement Agreements.

36. As a result of their reasonable reliance upon the WestEnd Defendants' false representations, Plaintiffs have been damaged in an amount to be proven at trial but in excess of $873,000.

37. The actions of the WestEnd Defendants described herein were taken with substantial certainty that such acts would cause harm to Plaintiffs, in conscious disregard for the rights of Plaintiffs and by conduct that was despicable and done with malice and ill-will and intent to harm Plaintiffs, such as to constitute oppression, fraud, malice, and despicable conduct under Cal. Civ. Code § 3294, entitling Plaintiffs to exemplary damages in an amount appropriate to punish and set an example of the WestEnd Defendants.

38. Plaintiffs will suffer substantial harm if the Settlement Agreements are not rescinded.

39. Plaintiffs intended the service of this First Amended Complaint filed on October 16, 2015, and the service of this Second Amended Complaint, to serve as notice of rescission of the Settlement Agreements, and hereby demand that the WestEnd Defendants restore to Plaintiffs the consideration furnished by Plaintiffs to the WestEnd Defendants pursuant to such Agreements, specifically the more than $873,000 paid by Plaintiffs pursuant to such Agreements, and offer to return anything of value that Plaintiffs received under such Agreements.

40. Plaintiffs are entitled to a constructive trust over the monies that they paid the WestEnd Defendants as a result of the WestEnd Defendants' fraud, and all proceeds therefrom.

# **PRAYER**

WHEREFORE, Plaintiffs Dependable Solutions, Inc., Dependable Rights, Ltd., and Martin Malysz pray for judgment against the WestEnd Defendants, and each of them, as follows:

1. For rescission of the Settlement Agreements, and for return to Plaintiffs of all monies paid in connection with such Agreements, in an amount to be proven at trial, but in no event less than $873,000;

2. For a constructive trust over all monies acquired by the WestEnd Defendants from Plaintiffs, and all proceeds therefrom;

3. For punitive damages in an amount to be established at the time of trial;

4. For reasonable attorneys' fees to the extent allowed by statute or contract;

5. For costs and expenses of suit; and

6. For such other and further relief as the Court deems just and proper.

Dated: November 17, 2015

                                            PILLSBURY WINTHROP SHAW PITTMAN LLP
                                            Jeffrey D. Wexler


By:   /s/ Jeffrey D. Wexler
       Jeffrey D. Wexler, Attorneys for Plaintiffs and Counterdefendants Dependable Solutions, Inc., Dependable Rights, Ltd. and Martin Malysz and Counterdefendants Timothy Medora and The Medora Group, Inc.

## **DEMAND FOR JURY TRIAL**

Plaintiffs Dependable Solutions, Inc., Dependable Rights, Ltd., and Martin Malysz demand trial by jury on all issues triable at law.

Dated: November 17, 2015

                                     PILLSBURY WINTHROP SHAW PITTMAN LLP
                                     Jeffrey D. Wexler

By:    /s/ Jeffrey D. Wexler
         Jeffrey D. Wexler, Attorneys for Plaintiffs and Counterdefendants Dependable Solutions, Inc., Dependable Rights, Ltd. and Martin Malysz and Counterdefendants Timothy Medora and The Medora Group, Inc.